MATTER OF SANCHEZ AND ESCOBAR

In Deportation Proceedings

A-24224793
A-24235796

*Decided by Board October 15, 1985*

(1) The United States Court of Appeals for the Ninth Circuit has concluded that the "well-founded fear" standard for asylum and the "clear probability" standard for withholding of deportation are meaningfully different and that the former is "more generous" than the latter.

(2) In describing the amount and type of evidence required to establish that a fear of persecution is "well founded," the Ninth Circuit has held that an alien must point to specific, objective facts that support an inference of past persecution or risk of future persecution; that the necessary objective facts may be established through the credible and persuasive testimony of the alien; and that only after objective evidence sufficient to suggest a risk of persecution has been introduced do the alien's subjective fears become relevant.

(3) The term "persecution" as it appears in section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (1982), requires that the alien demonstrate a well-founded fear that he would be targeted for harm or suffering on the basis of one of the enumerated grounds within the Act for which asylum may be granted.

(4) Our conclusion that the harm resulting from country-wide civil strife and anarchy is not persecution is based not only on the pre-1980 construction of the word "persecution" but also on the fact that Congress specifically rejected a definition of "refugee" in section 101(a)(42)(A) of the Act that would have included "displaced persons," *i.e.*, individuals who flee wide-spread conditions of indiscriminate violence resulting from civil war or military strife in a country.

(5) Throughout these proceedings the respondents have argued that they have a well-founded fear of persecution if returned to El Salvador on the basis of their "membership in a particular social group," comprised of young (18 to 30 years of age), urban, working-class males of military age who have not served in the military or otherwise affirmatively demonstrated their support for the Government of El Salvador; however, the respondents have not established the existence of a "particular social group" which is persecuted on account of the group's specific identifying characteristics and whose treatment based on those characteristics is distinct from the general population.

(6) While the respondents have shown statistically that many of those being killed in El Salvador are young males, a purely statistical showing is not by itself sufficient proof of the existence of a persecuted group; additionally, it is not enough to simply identify the common characteristics of a statistical grouping of a portion of

the population at risk, but in the context of the asylum and withholding provisions related to "membership in a particular social group" under the Act there must be a showing that the claimed persecution is on account of the group's identifying characteristics.

CHARGE:

Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—Entered without inspection (both respondents)

ON BEHALF OF RESPONDENTS:
Marc Van Der Hout, Esquire
3689—18th Street
San Francisco, California 94110

Carolyn P. Blum, Esquire
International Institute, East Bay
297 Lee Street
Oakland, California 94610

ON BEHALF OF SERVICE:
Beverley M. Phillips
General Attorney

BY: Milhollan, Chairman; Maniatis, Dunne, Morris, and Vacca, Board Members

In a well-written decision dated September 7, 1982, resulting from jointly held deportation proceedings, an immigration judge found the respondents deportable as charged, denied their requests for asylum and withholding of deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1982), but granted them the privilege of voluntary departure, with an alternate order of deportation to El Salvador. The respondents have appealed. The appeal will be dismissed.

Luis Alonzo *Sanchez*-Trujillo is a 32-year-old native and citizen of El Salvador who last entered the United States without inspection at San Ysidro, California, on or about November 29, 1979. The co-respondent, Luis Armando *Escobar*-Sanieto, is a 24-year-old native and citizen of El Salvador who last entered this country without inspection at San Ysidro, California, in June 1980. At their deportation hearing, begun on April 12, 1982, and completed on June 18, 1982, the respondents, who were represented by counsel, admitted the factual allegations contained in their respective Orders to Show Cause and Notice of Hearing (Form I-221) and conceded deportability for entry without inspection under section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2) (1982). The respondents do not now challenge the finding of deportability, and we are satisfied from a review of the record that they received a fair hearing and that their deportability has been established by evidence which is clear, unequivocal, and convincing as required by *Woodby* v. *INS*, 385 U.S. 276 (1966). The only issue to be decided by the present appeal is whether the

respondents' requests for asylum and withholding of deportation were properly denied.[1]

On appeal, the respondents argue that the immigration judge failed to apply the proper legal standard in evaluating their requests for asylum and withholding of deportation and that the record establishes the existence of a legally cognizable "particular social group," as well as the respondents' membership in that group. They argue that they have a well-founded fear of persecution based on that membership. They further contend that the record establishes a well-founded fear of persecution based on actual and imputed political opinion, that respondent *Escobar* was a victim of actual persecution prior to his departure from El Salvador, and that respondent *Sanchez* has a well-founded fear of persecution based on his religion and membership in his church's "Christian community" or "youth group." Finally, it is submitted that the immigration judge improperly excluded certain documentary evidence, that the Government should be compelled to disclose any evidence in its possession which is favorable to the respondents' asylum claims, and that returning the respondents to El Salvador constitutes cruel and unusual punishment in violation of the eighth amendment.

The respondents bear the evidentiary burdens of proof and persuasion in any application for withholding of deportation under section 243(h) or asylum under section 208 of the Act. *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985); 8 C.F.R. §§ 208.5, 242.17(c) (1985). The respondents must establish the facts underlying their claims for such relief by a preponderance of credible, probative evidence. They must also establish that the facts proven satisfy the statutory standards of eligibility for these forms of relief. As this case arises within the jurisdiction of the United States Court of Appeals for the Ninth Circuit, the law of that circuit controls.

To be eligible for withholding of deportation pursuant to section 243(h) of the Act, an alien's facts must show a clear probability of persecution in the country designated for deportation on account of race, religion, nationality, membership in a particular social group, or political opinion. *INS* v. *Stevic*, 467 U.S. 407 (1984); *Bolanos-Hernandez* v. *INS*, 767 F.2d 1277 (9th Cir. 1984). This means that the alien's facts must establish that it is more likely than not he would be subject to persecution for one of the grounds specified. *INS* v. *Stevic, supra*, at 429–30.

---

[1] Under the regulations of the Immigration and Naturalization Service, an application for asylum made after the institution of deportation proceedings shall also be considered as a request for withholding of deportation. 8 C.F.R. § 208.3(b) (1985).

To be eligible for asylum under section 208 of the Act, an alien must meet the definition of a "refugee," which requires him to show persecution or a well-founded fear of persecution in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion. Section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982); section 208 of the Act. The Board's analysis of this standard is set forth in *Matter of Acosta, supra.* The Ninth Circuit has concluded that the "well-founded fear" standard and the "clear probability" standard are meaningfully different and that the former is "more generous" than the latter. *Cardoza-Fonseca* v. *INS,* 767 F.2d 1448, 1451 (9th Cir. 1985); *Bolanos-Hernandez* v. *INS, supra,* at 1282. In describing the amount and type of evidence required to establish that a fear of persecution is "well founded," the Ninth Circuit has held:

> Applicants must point to specific, objective facts that support an inference of past persecution or risk of future persecution. That the objective facts are established through the credible and persuasive testimony of the applicant does not make those facts less objective. "Mere assertions of possible fear" are still insufficient. *Shoaee* v. *INS,* 704 F.2d 1079, 1084 (9th Cir. 1983). It is only after objective evidence sufficient to suggest a risk of persecution has been introduced that the alien's subjective fears and desire to avoid the risk-laden situation in his or her native land become relevant.

*Cardoza-Fonseca* v. *INS, supra,* at 1453.

In the case before us, the respondents have not shown a clear probability of persecution under section 243(h) or a well-founded fear of persecution under section 208(a) of the Act, as that standard is described in *Cardoza-Fonseca* v. *INS, supra,* based on any of the enumerated grounds within the Act for which asylum and withholding of deportation may be granted.

The record contains more than 1,860 pages of transcript, spanning 15 days of hearing, and includes the testimony of 13 witnesses. During the course of these proceedings, the respondents have submitted more than 51 exhibits and addenda, containing approximately 1,200 pages, consisting of newspaper and magazine articles, scholarly reports, news releases, sworn statements, letters and other publications by people and international organizations involved or interested in the Salvadoran conflict. This evidence documents the conditions in El Salvador and the violence perpetrated against the population of that country through 1982. The evidence has been adequately and fairly discussed by the immigration judge in his decision and by the parties in their briefs on appeal.

During the hearing, respondent *Escobar* testified that between 1976 and 1980 he was employed as an auto mechanic for the Toyota dealership in San Salvador. He was laid off in April 1980 when a portion of the premises of that dealership was destroyed by bombs.

He stated that in April 1980, while walking home from a movie at approximately 11 o'clock in the evening, he was attacked by two men in civilian clothes who placed him in an unmarked van with government license plates, beat him, questioned him with regard to guerrilla activities, robbed him, threatened him with death, and threw him from the van approximately an hour and a half later. He subsequently recognized one of his assailants who was riding in a vehicle which belonged to the municipal police. The respondent could ascribe no motive for the incident.

The respondent participated in two demonstrations while in El Salvador. The first occurred in October 1979 and involved a protest on behalf of mothers of disappeared children and relatives. The respondent joined the group as it passed by his house and walked with them for an hour carrying a peace flag. He left the demonstration before it reached the Plaza Libertad, where government troops fired on the demonstrators, killing more than 70 people. He stated that he participated in the demonstration because he was against the atrocities the Government was committing. In March 1980 he participated in the funeral of Archbishop Romero. He stated that thousands of people had gathered in an area between the national cathedral and the presidential palace, that he was on the outskirts of the demonstration, and that he observed smoke bombs dropping from the presidential palace, heard gunshots, and saw some of the demonstrators killed. The record contains no evidence that respondent *Escobar* was ever stopped or questioned as a result of his participation in either of these demonstrations, or that he was otherwise identified by government forces as a participant.

The respondent testified that three of his young male friends had been killed in Santa Cruz Michapa by the national guard when they attempted to run away. In May 1980 the respondent observed the bodies of five young men, ranging from 15 to 32 years old, who had been killed near Santa Cruz Michapa. Their bodies had been disfigured and dismembered. In February 1980, a 26-year-old male friend of the respondent was killed in San Salvador. It was believed that he had been killed by the national guard. The respondent stated that he had also seen the bodies of six young males on the road to the airport and that they had all been shot through the head. The respondent had no knowledge of the actual circumstances surrounding any of these deaths. The respondent admitted that he had never publicly spoken out against the Government because of the danger and that such conversations were limited to his friends. Similarly, the respondent never belonged to any labor union because of the danger membership in such associations represented. He stated that he had not served in the army because he

had objected to the way that the military recruited young men and that he had avoided being recruited by staying in his house when the army was in the area.

In May 1980 the respondent applied for and received a valid passport from government authorities with a tourist visa for Mexico. He had no difficulties in obtaining the passport and departed the country 3 days later. He stated that the bus he was traveling on was stopped twice by government forces before crossing the border. On both occasions his passport was inspected and he was permitted to proceed without incident. Subsequent to his arrival in the United States, the respondent was informed that several of his co-workers from the Toyota dealership were killed when the car they were in was machine gunned. The respondent stated that they had been traveling late at night to one of the beach areas and may have been killed as a result of curfew violations.

Respondent *Sanchez* testified that he was employed in El Salvador as an electrician until his departure from the country on November 22, 1979. The respondent was accompanied by his father at the time of his departure. They applied for and received valid passports with tourist visas for Mexico from government authorities and were permitted to depart the country without incident.

The respondent admitted that he was not politically active while in El Salvador and that he never publicly spoke out against the Government or expressed the views and opinions held by Archbishop Romero and his parish priest, Father Villaran. Four of the respondent's brothers, whose ages range between 22 and 33, continue to live and work in El Salvador. There is no evidence that any of the respondent's brothers have ever been arrested, imprisoned, or otherwise persecuted. His last contact with his family in El Salvador was in November 1981. At that time there was no indication that they were experiencing any problems except for increased inflation resulting in higher food costs.

The respondent testified that between October and November 1979 he was stopped and interrogated on four occasions by members of the national guard. On each of these occasions the respondent was waiting with others at a bus stop when the national guard required them to submit to a search for weapons and documents. The respondent stated that the national guard brandished their weapons, used abusive language, and threatened to kill anyone who did not cooperate. The respondent admitted that on none of these occasions was anyone harmed or arrested. Except for these four incidents, the record contains no evidence that the respondent had any other contact with government or guerrilla forces which resulted in harm or threats of harm.

281

The respondent's only organizational involvement while in El Salvador was as a member of his church's "Catholic committee" or "Catholic community," a youth group of 20 people, mostly in their late teens, who assisted the parish priest in planning certain religious celebrations and performing other internal functions of the church. The respondent participated in this group beginning in 1977 and continued until approximately September 1979. He stated that the "Catholic committee" was not politically involved and had no political significance. Nor does the record contain any evidence which suggests that the members of this "Catholic committee" were ever arrested, imprisoned, or otherwise persecuted as a result of their participation in the group. Respondent *Sanchez* related two incidents involving demonstrations which took place in the vicinity of his church and were violently dispersed by the national guard, resulting in the deaths of many of the demonstrators. He admitted that these demonstrations were not sponsored by his church, that his priest took no active role in them, and that the church's "Catholic committee" did not participate in the demonstrations.

Subsequent to his arrival in the United States, the respondent joined an organization known as Frente Unido Salvadoreno (FUS), a solidarity group concerned with the conditions of the people of El Salvador. The respondent also attended a demonstration in front of the El Salvadoran Consulate following the death of Archbishop Romero. The respondent terminated his active participation in FUS in August 1981 as a result of employment conflicts. Although the respondent strongly suspected that his participation in FUS activities in this country was known by the Government of El Salvador, he admitted that he had not actually heard, seen, or experienced anything which established a basis to conclude that he was known by name, had been identified by name, or would be singled out for mistreatment by the Government of El Salvador.

Much of the testimony and documentary evidence submitted by the respondents concerned the general conditions of violence in El Salvador. The evidence reflects that as of 1982, the threat of injury or death in El Salvador was country-wide, affecting the entire civilian population and reaching both males and females of every age group. The record suggests, contrary to the respondents' claims, that an individual's sex and age were not significant factors with regard to the risk of harm. Rather, the risk of harm appears to have been in large part a function of the coincidental violence of country-wide civil strife, resulting from misidentification, curfew violations, or simply being in the wrong place at the wrong time. Considerable evidence was offered relating to claims that persecution occurred because of participation in specific groups that active-

ly and publicly opposed the Government's policies, including campesino [2] or agrarian reform groups, union leaders and active members of labor movements, religious leaders and activists, educators and active members of teachers unions, medical and health care professionals, journalists, and human rights activists and workers. The respondents have not claimed, nor does the evidence establish, their membership in any of the identified groups. The evidence, as a whole, demands the conclusion that as of 1982 the militarily controlled Government of El Salvador was in crisis, that there existed country-wide civil strife and anarchy, that the Government, in response to the crisis, was intolerant of public opposition to its policies, and that the violence taking place in El Salvador at the hands of the government forces and guerrillas reached all segments of that country's civilian population.[3]

To be eligible for a grant of asylum, an alien must demonstrate that he is a "refugee" within the meaning of section 101(a)(42)(A) of the Act.[4] The definition of "refugee" contained in that section has four elements that must be satisfied: (1) The alien must show a "fear" of "persecution"; (2) that fear must be "well founded"; (3) the "persecution" must be "on account of race, religion, nationality, membership in a particular social group, or political opinion"; and (4) the alien must show he is unable or unwilling to return to his country of nationality or to the country in which he last habitually resided because of persecution or a well-founded fear of persecution.

---

[2] The term "campesino" as used here refers to peasant farmers and their families located in the rural areas of El Salvador.

[3] Because these proceedings are adversarial in nature, our findings with regard to the conditions in El Salvador must be based solely on the record before us. These findings are limited to the present record and do not purport to constitute anything other than our assessment of the evidence presented.

[4] Congress added a definition of refugee to our law by means of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. In so doing, Congress intended to conform the Immigration and Nationality Act to the United Nations Protocol Relating to the Status of Refugees, January 31, 1967 [1968], 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol"), to which the United States had acceded in 1968. H.R. Rep. No. 781, 96th Cong., 2d Sess. 19, reprinted in 1980 U.S. Code Cong. & Ad. News 160, 160; S. Rep. No. 256, 96th Cong., 1st Sess. 4, 14–15, reprinted in 1980 U.S. Code Cong. & Ad. News 141, 144, 154–55; H.R. Rep. No. 608, 96th Cong., 1st Sess. 9–10 (1979); see also INS v. Stevic, supra, at 422. Section 101(a)(42)(A) defines a refugee as

any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

Prior to inclusion of the definition of a refugee in section 101(a)(42)(A) of the Act, the term "persecution" was construed to mean either a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive. *Cardoza-Fonseca* v. *INS, supra,* at 1452; *Bolanos-Hernandez* v. *INS, supra,* at 1283 n.13; *Matter of Acosta, supra,* at 222. One of the significant aspects of this construction of "persecution" was the concept that the harm or suffering had to occur as the result of a belief or characteristic an oppressor sought to overcome or punish in an individual. *Matter of Acosta, supra.* This concept required an individual to show he would be singled out or treated differently from others in his country because he possessed a characteristic a persecutor sought to punish. *See, e.g., Matter of Surzycki,* 13 I&N Dec. 261, 262 (BIA 1969). It also meant that generally harsh conditions shared by many others in a country and the harm arising out of civil strife did not amount to "persecution" within the meaning of our law. *Matter of Acosta, supra; see also Cheng Kai Fu* v. *INS,* 386 F.2d 750, 753 (2d Cir. 1967), *cert. denied,* 390 U.S. 1003 (1968).

We have recently concluded that, in using the term "persecution" in the definition of a refugee, Congress intended to adopt the previously accepted construction of that term. *Matter of Acosta, supra.* Thus, it follows that "persecution" as it appears in section 101(a)(42)(A) of the Act requires that the alien demonstrate a well-founded fear that he would be targeted for harm or suffering on the basis of one of the enumerated grounds within the Act for which asylum may be granted. *Id.; cf. INS* v. *Stevic, supra; Rejaie* v. *INS,* 691 F.2d 139 (3d Cir. 1982); *Moghanian* v. *United States Department of Justice,* 577 F.2d 141 (9th Cir. 1978); *Matter of Dunar,* 14 I&N Dec. 310 (BIA 1973). Furthermore, the tragic and widespread savage violence affecting all Salvadorans as the result of civil strife and anarchy is not persecution. *Zepeda-Melendez* v. *INS,* 741 F.2d 285, 289-90 (9th Cir. 1984); *Chavez* v. *INS,* 723 F.2d 1431, 1434 (9th Cir. 1984); *Sanchez* v. *INS,* 707 F.2d 1523, 1526-28 (D.C. Cir. 1983); *Martinez-Romero* v. *INS,* 692 F.2d 595, 595-96 (9th Cir. 1982), *aff'g Matter of Martinez-Romero,* 18 I&N Dec. 75 (BIA 1981); *Matter of Acosta, supra.*

Our conclusion in this regard is based not only on the pre-1980 construction of the word "persecution," but also on the fact that Congress specifically rejected a definition of "refugee" in section 101(a)(42)(A) of the Act that would have included "displaced persons," *i.e.,* individuals who flee widespread conditions of indiscriminate violence resulting from civil war or military strife in a country. *Matter of Acosta, supra.* Indeed, we note that, in discussing the

limitations inherent in the definition of a "refugee" under the Act, Senator Alan K. Simpson stated in 1981:

The statute says "persecution on account of race, religion, nationality, membership in a particular social group or political opinion." That is all it says. So a country can be exceedingly dangerous and perilous for human beings and in no case would that qualify the people leaving that country as refugees under U.S. law. I think that it is very critical to keep this in mind, and each time I hear the phrase "persecution" I am going to refer back to the statute, and hope others will, and read exactly what it says. So it is going to be an interesting few months.

. . . [I]t really does not say that you can include a person in the definition of refugee who is just scared to death of his country or the turmoil in his country.

Special Project, *Displaced Persons: "The New Refugees,"* 13 Ga. J. Int'l. and Comp. Law 755, 757 n.8 (1983) (citations omitted).[5]

Throughout these proceedings the respondents have argued that they have a well-founded fear of persecution if returned to El Salvador on the basis of their "membership in a particular social group," comprised of young (18 to 30 years of age), urban, working-class males of military age who have not served in the military or otherwise affirmatively demonstrated their support for the Government of El Salvador. They claim that the group to which they belong is a legally distinct and cognizable social group, citing a series of jury composition cases as applicable precedent on the question of group cognizability. *See Hernandez* v. *Texas,* 347 U.S. 475 (1954); *Ciudadanos Unidos de San Juan* v. *Hidalgo County Grand Jury Comm'rs,* 622 F.2d 807 (5th Cir. 1980), *cert. denied,* 450 U.S. 964 (1981).

The respondents have shown statistically that many of those being killed in El Salvador are young males. This is not surprising in view of the ongoing country-wide civil strife which presently exists in El Salvador. Historically, it has been the young who have primarily been involved in both the internal and external armed conflicts of a country. Although it may be an element of the proof, a purely statistical showing is not by itself sufficient proof of the existence of a persecuted group. It is not enough to simply identify the common characteristics of a statistical grouping of a portion of the population at risk. In the context of the asylum and withholding provisions related to "membership in a particular social group" under the Act, there must be a showing that the claimed persecu-

---

[5] *See* Office of the United Nations High Commissioner for Refugees, *Handbook of Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* 39 (Geneva, 1979), stating that "[p]ersons compelled to leave their country of origin as a result of international or national armed conflicts are not normally considered refugees under the 1951 Convention or 1967 Protocol."

tion is on account of the group's identifying characteristics.[6] This the respondents have not shown.

The record does not establish that individuals in El Salvador are singled out for persecution on the basis of their age. Nor has it been established that individuals are targeted for persecution on the basis of urban residence. Similarly, there has been no showing that the risk of persecution is based solely on the masculine gender. Nor has it been shown that economic status or means of livelihood is a basis for persecution in El Salvador. On the contrary, the record indicates that both the government forces and guerrillas are actively seeking support from all segments of the population. It is not the above characteristics, singularly or in the aggregate, which form the basis of a realistic likelihood of persecution. Rather, the only factor shown to be a basis for persecution in El Salvador within the meaning of the Act is the nonsupport or opposition to the respective political positions of the Government and the guerrilla forces. Absent this core factor or characteristic, which is essentially a political opinion-based ground of persecution, the risk of harm on the basis of the other characteristics claimed by the respondents has not been shown. Where this factor does exist, the resulting risk of persecution is not limited to young urban males but equally affects all segments of the rural and urban populations of El Salvador.

We are satisfied from a review of the record that the respondents have not established the existence of a "particular social group" which is persecuted on account of the group's specific identifying characteristics and whose treatment based on those characteristics is distinct from the general population. The only characteristic shown to be a basis for persecution is the individual's actual or perceived political opinions. While we recognize that a "particular social group" may embody or overlap one or more of the other enumerated grounds for which asylum and withholding of deportation may be granted, the existence of a "particular social group" is not established solely on the basis of such ground.

Nor have the respondents established that their claims of persecution on the basis of political opinion or religion are well founded within the meaning of the Act. The respondents have presented no "specific, objective facts that support an inference of past persecu-

---

[6] We note that even the jury composition decisions, relied on by the respondents to show legal cognizability of a social group, required a showing that the actual treatment of the claimed group was on account of national origin and age, respectively, and that such treatment was distinct or different from that of the general community. *See Hernandez v. Texas, supra,* at 478–79; *Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Comm'rs, supra,* at 816–18.

286

tion or risk of future persecution." *Cardoza-Fonseca* v. *INS, supra,* at 1453.

In the present case, there is no evidence of any personal experiences or other objective events that demonstrate that the respondents hold political opinions or religious beliefs the Government seeks to punish. Nor have the respondents shown that the Government is aware, or could easily become aware, that they hold such opinions and beliefs. Neither respondent was politically active in El Salvador, or called public attention to himself by expressing opposition to the Government, or affiliated himself with trade unions or other politically active opposition groups. Neither of the demonstrations that respondent *Escobar* participated in was shown to have brought him into official contact with the Government or to have resulted in his detention or persecution. There are no facts that show he was identified by the Government as having been a participant in these demonstrations. Although respondent *Sanchez* was a member of his church's youth group from 1977 until 1979, there are no facts showing the group was politically active or that any members of the group were ever punished by the Government, whether on the basis of their religious beliefs or political opinions. While the priest who directed the group was detained and apparently tortured, the evidence shows that this incident resulted from an unrelated demonstration taking place near the church, and not from a specifically directed attack on the church or priest because of the youth group's activities or existence. Neither respondent ever received specific threats as a result of his political and religious beliefs. Nor is there any evidence that respondent *Sanchez*'s activities in this country between November 1979 and August 1981, while a member of FUS, are known by the Government of El Salvador.

Moreover, the respondents' experiences do not show that the Government of El Salvador has the inclination or willingness to single them out for persecution. Neither of the respondents was ever arrested, imprisoned, or otherwise persecuted in El Salvador because of his political opinions. There is no indication that the incident in which respondent *Escobar* was beaten and robbed, while walking home after curfew, was other than a random criminal act. The record does not suggest that his assailants knew who he was or had targeted and singled him out for political reasons. The death threat he received appears to be related to the accomplishment of the robbery and not the result of political motivations. He remained in El Salvador for a month following the incident without further threats or harm. Nor do the four occasions in which respondent *Sanchez* was subjected to document checks and weapon

searches constitute "persecution." These incidents were coincidental to the prevalent conditions of violence in El Salvador and the happenstance of time and location. Moreover, both of the respondents were given valid passports and permitted to depart the country without incident. Respondent *Sanchez*'s four brothers continue to live and work in El Salvador, and there is no evidence that they have ever been arrested, imprisoned, or otherwise harmed. We conclude that the respondents have not shown eligibility for asylum under any of the enumerated grounds for which that relief may be granted. The respondents have not shown any special, individualized circumstances indicating that they have been or will be singled out for persecution beyond the general threat of harm affecting the entire population. *See Chavez* v. *INS, supra*. We find that the respondents are more akin to "displaced persons," having fled the widespread violence which exists in El Salvador, than "refugees" within the meaning of the Act. The respondents' risk of harm is no greater than that experienced by all other Salvadorans.[7]

For the reasons contained in the above discussion, we also conclude that the respondents have not established eligibility for withholding of deportation. As we have previously indicated, an application for withholding of deportation under section 243(h) of the Act must be "supported by evidence establishing that it is more likely than not that the alien would be subject to persecution for one of the grounds specified." *INS* v. *Stevic, supra*, at 429-30. The Ninth Circuit has concluded that the well-founded fear standard under section 208(a) of the Act is "more liberal" or "more generous" than the clear probability standard under section 243(h) of the Act. *See Cardoza-Fonseca* v. *INS, supra; Bolanos-Hernandez* v. *INS, supra*. Since we have already concluded that the respondents' facts do not demonstrate a well-founded fear of persecution at the hands of the Government for purposes of asylum on account of "membership in a particular social group," "political opinion," or "religion" within the meaning of the Act, it follows that the respondents' evidence does not show a clear probability of persecution required for withholding of deportation.

Finally, the respondents' arguments that the immigration judge improperly excluded certain documentary evidence, that the Government should be compelled to disclose any evidence in its posses-

---

[7] Our conclusion that the respondents' risk of harm is no greater than that suffered by the general population, in view of the country-wide conditions of violence and anarchy, does not preclude an alien from El Salvador from showing that he has been singled out for persecution and thus qualifies as a "refugee" within the meaning of the Act. We conclude only that the respondents here have not made such a showing.

sion favorable to their asylum claims, and that returning them to El Salvador constitutes cruel and unusual punishment in violation of the eighth amendment are without merit. The record clearly shows that the immigration judge permitted the respondents every opportunity to fully present their asylum claims. If he erred, he did so in their favor. There has been no showing of prejudice concerning the excluded documents. *See Nicholas v. INS*, 590 F.2d 802, 809 (9th Cir. 1979). The respondents have not identified any evidence which they believe is favorable to their claims and in the possession of the Government. Nor have they shown that the Government intentionally withheld such evidence. The argument that no one should be returned to El Salvador because of the present conditions of anarchy and country-wide violence has been rejected. *Martinez-Romero v. INS, supra.* Moreover, deportation is a civil consequence and has never been regarded as punishment for a crime. Consequently, it does not violate the eighth amendment's prohibition of cruel and unusual punishment. *See, e.g., Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893); *Burr v. INS*, 350 F.2d 87, 90-91 (9th Cir. 1965), *cert. denied*, 383 U.S. 915 (1966).

In view of the conditions which presently exist in El Salvador, we share the respondents' concern for their welfare. However, the respondents have not established their eligibility for the requested relief, and we must, accordingly, dismiss the appeal.

**ORDER:** The appeal is dismissed.

**FURTHER ORDER:** Pursuant to the immigration judge's order and in accordance with our decision in *Matter of Chouliaris*, 16 I&N Dec. 168 (BIA 1977), the respondents are permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; in the event of failure so to depart, the respondents shall be deported as provided in the immigration judge's order.