[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-11901
Non-Argument Calendar

_____

Agency No. A094-889-312

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 22, 2011
JOHN LEY
CLERK

HIKMAT SALAMEH ABEDALFATTAH,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(April 22, 2011)

Before CARNES, PRYOR, and ANDERSON, Circuit Judges.

PER CURIAM:

Hikmat Abedalfattah seeks review of the Board of Immigration Appeals'

decision affirming and adopting the Immigration Judge's order of removal to

Jordan and denial of his applications for asylum, withholding of removal under the

Immigration and Nationality Act, and relief under the United Nations Convention

Against Torture and Other Cruel, Inhuman, or Degrading Treatment or

Punishment, 8 U.S.C. §§ 1158(a), 1231(b)(3), 8 C.F.R. § 208.16(c). Abedalfattah

is a Jordanian citizen.[1] He lived in that country from his birth in 1966 until 1994,

when he moved to the city of Ramallah in the Occupied Territories on the West

Bank.[2] He has a Jordanian and a Palestinian passport.

Abedalfattah contends that his credible testimony was sufficient to meet his

burden of proof to establish eligibility for asylum, withholding of removal, and

CAT relief. He argues that if corroborative evidence were required, the IJ should

have given him notice of that. He also asserts that substantial evidence does not

support the BIA's decision that he failed to show that he would be singled out for

---

[1] Abedalfattah was born in Ramallah in 1966 as a Jordanian citizen because at the time of his birth Ramallah was under Jordanian rule. In 1967 his family, including Abedalfattah, moved from Ramallah to another part of Jordan where he remained until he returned to Ramallah in 1994. At the time of his return, Ramallah was no longer under Jordanian rule.

[2] For consistency, we use the BIA's terminology of "the Occupied Territories" to describe Ramallah and the West Bank area.

persecution, that he would be tortured, or that he was part of a group that suffered from a pattern or practice of persecution.

I.

Abedalfattah's amended asylum application alleged persecution based on his race, religion, and nationality. He stated that in December 2000 while driving home to Ramallah from his work in Israel, Jewish settlers threw rocks at the car, causing him to lose control and flip the car. As a result of the accident he suffered a spinal injury and lost consciousness. A hospital discharge order detailing treatment following a traffic accident in December 2000 was one of the documents Abedalfattah submitted in support of his application. That document, dated January 2001, stated that Abedalfattah suffered head and spinal injuries but noted there was "no history of lost consciousness."

Abedalfattah's amended application also alleged that Israelis and Palestinians harassed him frequently at the checkpoints on his way to and from work. He asserted that Israelis believed he was aligned with the Intifada Movement, while Palestinians believed he was an Israeli spy. On one occasion in 2004, Israeli soldiers stopped the cab that he was sharing with a group of teachers. The soldiers questioned Abedalfattah and did not believe that he was returning

3

home from work. They pushed him to the ground, kicking and punching him for about twenty minutes. He eventually escaped but did not seek medical attention even though he was bruised and in pain from the beating.

At a hearing before the IJ, Abedalfattah testified about the December 2000 incident when some Israeli settlers threw rocks at the car he was driving, and he lost control of the car and wrecked. He testified that he was driving a taxi for the taxi driver, who was sleepy. Abedalfattah did not make any attempt to reach the taxi driver in order to get a corroborating statement or affidavit from him. Abedalfattah also testified about the 2004 incident when he was beaten by Israeli soldiers. He stated that he did not seek medical treatment and did not have documentary evidence of the incident. He admitted that Israelis were targeting all Palestinians that day and did not single him out.

In her oral decision the IJ noted several inconsistencies in Abedalfattah's testimony but made no adverse credibility finding. Instead, the IJ determined that Abedalfattah did not meet his burden under the REAL ID Act because he failed to provide sufficiently detailed testimony or corroborating evidence to support his claims, and his failed to show why corroborating evidence was not available. The IJ found that Abedalfattah's testimony was "full of generalities" and that he had not established past persecution or a well-founded fear of future persecution.

4

Abedalfattah also did not show why he could not safely relocate to Jordan, his country of citizenship at birth and at the present time, where he still has family. The IJ ordered Abedalfattah removed to Jordan or alternatively to the "Palestinian Authority." He appealed to the BIA.

The BIA held that the IJ did not err by concluding that Abedalfattah failed to provide or adequately explain the absence of reasonably available corroborating evidence. He did not submit affidavits from his wife or other family members corroborating any alleged threats. He did not submit photographs of the car wreck incident in 2000, or police reports, or affidavits from the cab driver or other witnesses. The BIA found that the evidence he did submit was inadequate. He relied on medical reports that were written in English, one of which was dated nearly two years after the alleged incident. Those reports did not provide details about the incident, and the hospital discharge report contradicted his claim that he lost consciousness. Finally, he provided no corroboration for his claim that he was beaten by soldiers in 2004, even though in his account of that incident, several teachers were in the car with him. The BIA found that corroborating evidence for these events should have been readily available. In addition to failing to establish past persecution, the BIA concluded that Abedalfattah had not shown a well-

founded fear of future persecution because he had failed to show that it would be unreasonable for him to relocate to Jordan.

## II.

"Where the BIA issues its own opinion, but expressly adopts the IJ's reasoning, we review both the BIA's and the IJ's decision." Shkambi v. U.S. Att'y Gen., 584 F.3d 1041, 1048 (11th Cir. 2009). The BIA adopted the IJ's reasoning in denying relief to Abedalfattah but did so "[i]n light of" the reasons set forth in its own opinion, so we review both the BIA's and the IJ's decisions. See id.

### A.

Abedalfattah contends that the IJ and the BIA erred by requiring him to produce corroborative evidence because his credible testimony entitled him to relief. He argues that the IJ should have given him notice that corroborating evidence was required to support his claim, and because he did not get that notice, the BIA should not have denied his claims based on the lack of corroborating evidence.

Abedalfattah's application for asylum, which was filed after May 11, 2005, is governed by the REAL ID Act of 2005. The Act provides that when the IJ "determines that the applicant should provide evidence that corroborates otherwise

6

credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii); see also Rapheal v. Mukasey, 533 F.3d 521, 527 (7th Cir. 2008) ("[U]nder the REAL ID Act, corroborating evidence may be required even if the applicant is credible."). Furthermore, "[n]o court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4).

Possibly anticipating that corroboration might be necessary, Abedalfattah submitted some documents along with his asylum application. Cf. Rapheal, 533 F.3d at 530 ("[T]he REAL ID Act clearly states that corroborative evidence may be required, placing immigrants on notice of the consequences for failing to provide corroborative evidence."). Instead of corroborating his testimony, however, at least one of those documents, the hospital discharge order dated January 2001, contradicted his testimony that he lost consciousness during the December 2000 incident involving the car wreck. Another report was dated nearly two years after the car wreck. The IJ found that other aspects of Abedalfattah's testimony were uncorroborated despite the fact that corroboration should have been readily available. Even though the IJ made no adverse credibility finding,

7

the IJ and the BIA acted within their discretionary authority when they considered Abedalfattah's failure to provide sufficient corroborative evidence. See Singh v. Holder, 602 F.3d 982, 988 (9th Cir. 2010) ("With section 1158(b)(1)(B)(ii), Congress has expressly empowered the IJ to require corroborating evidence even when the applicant has provided otherwise credible testimony. Should the applicant fail to offer corroboration, the IJ may conclude that despite the applicant's credible testimony, he has failed to meet his burden of demonstrating that he is entitled to asylum relief."). Nothing in the record compels the conclusion that corroborating evidence was unavailable. See 8 U.S.C. § 1158(b)(1)(B)(ii).

B.

Abedalfattah contends that substantial evidence does not support the IJ's and BIA's conclusion that failed to establish past persecution on account of his political opinion, religion, or national origin. We review the IJ's and BIA's factual determinations under the substantial evidence test. Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1344 (11th Cir. 2008). Under this test, "we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision," and "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the

record considered as a whole." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc) (quotation marks omitted). We may reverse only when the record compels it. Id. at 1027. "[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Id.

In absence of an adverse credibility determination we assume Abedalfattah to be credible, but even so the BIA's finding that he failed to meet his burden of proof is supported by substantial evidence. The evidence fails to demonstrate that Israeli settlers or soldiers singled out Abedalfattah for harm because of a protected ground. See Mehmeti v. U.S. Att'y Gen., 572 F.3d 1196, 1199 (11th Cir. 2009) (explaining that to meet his burden of showing refugee status "the applicant must, with specific and credible evidence, establish (1) past persecution on account of a statutorily protected ground or (2) a well-founded fear of future persecution on account of a protected ground") (quotation marks omitted). Unless an applicant shows that he was either persecuted or would be persecuted based on statutory ground, the fact that the alien may return to a country that is plagued by violence or conflict does not entitle him to asylum relief. See Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1263 (11th Cir. 2006); see also Matter of Sanchez and Escobar, 19 I. & N. Dec. 276 (BIA 1985) ("[T]he tragic and widespread savage violence affecting

9

all Salvadorans as the result of civil strife and anarchy is not persecution."). Also, to the extent that Abedalfattah alleges that suffered harm from Palestinian groups, it does not amount to more than threats and harassment and is not enough to establish past persecution. See Silva, 448 F.3d at 1237 (observing that persecution is "an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation") (quotation marks omitted). As a result, substantial evidence shows that Abedalfattah did not suffer past persecution based on a protected ground.

Abedalfattah also fails to demonstrate that the record compels a finding that he had a well-founded fear of future persecution. Substantial evidence supports the BIA's finding that he could avoid any future harm by relocating to Jordan. See Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1258–59 (11th Cir. 2006); 8 C.F.R. § 1208.13(b)(2)(ii). Abedalfattah is a Jordanian citizen, and he has a valid Jordanian passport that has not expired. Although he testified that a new law would require him to give up his Jordanian passport because he also has a Palestinian passport, he did not provide a citation to or evidence of that new law to the IJ or the BIA.[3] Substantial evidence supports the finding that he could

---

[3] In his brief to this Court Abedalfattah also failed to provide a citation to or evidence of any Jordanian law that would require him to give up his Jordanian passport. Furthermore, the record shows that his wife has a Jordanian passport and has used that passport to travel through

reasonably be expected to relocate to Jordan, the country of removal, to avoid future harm.[4]

Because Abedalfattah failed to establish his eligibility for asylum, he has necessarily failed to meet the higher standard for withholding of removal. See Djonda v. U.S. Att'y Gen., 514 F.3d 1168, 1177 (11th Cir. 2008). Also, based on Abedalfattah's failure to establish a well-founded fear of persecution, he is not entitled to CAT relief because he "cannot establish that it is more likely than not that he will be tortured based on a protected factor." Mehmeti, 572 F.3d at 1201.

C.

Finally, Abedalfattah contends that he is a member of a disfavored group that is subject to a pattern or practice of persecution. He argues that he will be persecuted based on his religion and national origin if he is forced to return to the

---

Jordan to the Occupied Territories on three occasions since 2005.

[4]Abedalfattah has abandoned any challenge to the IJ's determination that Jordan is the country of removal because he did not raise the issue on appeal. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005). Furthermore, when an alien refuses to designate a country of removal, the IJ and BIA have "very broad discretion" in designating a country to which the alien will be sent. Al Najjar v. Ashcroft, 257 F.3d 1262, 1295 (11th Cir. 2001). If the alien does not choose a county of removal, he may be removed to: (1) a country of which he is a citizen or national; (2) a country with which he has a lesser connection in the event that the alien is stateless, such as where he was born or from which he was admitted to the United States; or (3) any country whose government will accept the alien into that country. 8 U.S.C. § 1231(b)(2)(A)(i), (b)(2)(C), (D), and (E); Jama v. Immigration and Customs Enforcement, 543 U.S. 335, 125 S.Ct. 694, 699–700 (2005).

11

Occupied Territories.  As we have already explained, however, the IJ's order properly directs removal to Jordan, and Abedalfattah has presented no evidence that in Jordan there is a pattern or practice of persecution of a group of which he is a member.  See 8 C.F.R. § 1208.13(b)(2)(iii)(A), (B); see also Mehmeti, 572 F.3d at 1200.

**PETITION DENIED.**