NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0242n.06

No. 12-3771

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**Mar 08, 2013**
DEBORAH S. HUNT, Clerk

VAID HYZOTI; LULJETA HYZOTI; FJONA )
HYZOTI; and FJODI HYZOTI, )
     )
        Petitioners, )
     )
        v. )
     )
ERIC H. HOLDER, JR., Attorney General, )
     )
        Respondent. )
     )

ON PETITION FOR REVIEW
OF A FINAL ORDER OF THE
BOARD OF IMMIGRATION
APPEALS

BEFORE:  MERRITT, CLAY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Vaid Hyzoti and his wife and two children petition for review of the decision of the Board of Immigration Appeals ("Board") denying their motion to reopen removal proceedings.  Because the Board's decision was not an abuse of discretion, we deny the petition.

I.

Petitioners are natives and citizens of Albania.  They entered the United States in November 2000.  A month later, Vaid filed a petition for asylum that included derivative petitions for his wife and children.  Vaid claimed past persecution and a well-founded fear of future persecution on account of:  (1) his political opinion, including his political party affiliation, and support of the

Albanian monarchy; and (2) his work as a journalist. He also sought withholding of removal under the Immigration and Nationality Act and protection under the Convention Against Torture.

The Hyzoti family appeared before an immigration judge ("IJ") in connection with their asylum petitions. The IJ later denied all relief, concluding that Vaid was not credible and had not adequately corroborated his claims. The IJ further found that Vaid's testimony, even if credible, did not establish past persecution, and, alternatively, that a fundamental change in circumstances had since occurred in Albania such that the family no longer had a well-founded fear of future persecution even had they established one initially.

Upon review, the Board agreed that fundamental changes in Albania precluded relief. (It did not address the IJ's findings on credibility and past persecution.) The Board pointed specifically to a U.S. Department of State Country Report for 2004, which indicated that, although "serious political repression existed in the past, there are no indications of systemic political persecution in Albania at the present time." It further noted that "there are no indications that the Socialist Party, either through its own organization or through authorities, is engaged in a pattern of repression or violent behavior against its opponents," of which Vaid, as a former member of the Legality and Democratic parties, was one. The family petitioned for review, but we upheld the agency's ruling as supported by substantial evidence.

The Hyzotis declined to leave the country. Three and a half years later, they asked the Board to reopen their case based upon changed circumstances in Albania. In support of that request, Vaid submitted a personal statement and expert reports from university professors Dr. Bernd Fischer and

Dr. Brian Williams detailing the current political culture and "pervasive problem of sex trafficking" in Albania. (Vaid claimed his daughter faces an increased risk of being kidnaped into prostitution because of her father's political views.) Various news articles and reports also were submitted. The Board denied their motion. This timely petition followed.

II.

The decision whether to reopen removal proceedings is a matter of broad Board discretion. *See* 8 C.F.R. § 1003.2(a). We review a decision to deny reopening for an abuse of that discretion, which occurs if the decision lacks "a rational explanation, inexplicably departs from established policies, or rests on an impermissible basis such as invidious discrimination." *Yu Yun Zhang v. Holder*, 702 F.3d 878, 879 (6th Cir. 2012) (brackets and internal quotation marks omitted). We will not reverse the Board simply because we would have decided the matter differently in the first instance. *See Alizoti v. Gonzales*, 477 F.3d 448, 453 (6th Cir. 2007).

III.

An alien subject to a final order of removal is limited to one motion to reopen and must file within ninety days of being ordered removed. 8 U.S.C. § 1229a(c)(7)(A), (C)(i). These limits do not apply, however, if the alien seeks asylum and can show "changed country conditions" arising in the country of removal using evidence that is "material and was not available and would not have been discovered or presented at the previous proceeding." *Id.* § 1229a(c)(7)(C)(ii).

Petitioners' motion to reopen was based upon their claim that country conditions in Albania had changed for the worse since they were ordered removed (in 2005). The Board gave two reasons

for denying the motion, reasons we consider separately.[1]  First, it concluded that petitioners failed

to show that much of the evidence submitted was unavailable and could not have been discovered

or presented at the hearings in 2005.  That conclusion was rational.  Extensive portions of Dr. Bernd

Fischer's report concern Albania's political and social climate generally—including the prevalence

of police corruption, crime, and the lack of an independent judiciary—and could have been presented

in 2005.  And his critique of the accuracy of the U.S. Department of State's Country Conditions

Reports as "often paint[ing] too positive of a picture of domestic conditions in Albania and

overlook[ing] serious problems" was an argument petitioners could have made previously.

Large portions of Dr. Brian Williams's report suffer from the same flaw.  The report mostly

summarizes news articles that recount stories told by young Albanian women abducted by sex

traffickers and sold into prostitution slave trades in other countries.  But many of the articles either

bear no date or predate 2005.

Much of Vaid's personal statement is similarly irrelevant for reopening purposes.  He restates

his fear of returning to Albania, but adds little that is new.  He notes that his political opponents

previously threatened to kidnap his daughter and fears they will follow through if she returns to

Albania.  The basis for this fear stems in part from his niece's abduction in 1996.  He declined to

mention the kidnaping at his merits hearing apparently because the immigration judge refused to

---

[1]The Board also noted in passing petitioners' failure to file with their motion an application
for asylum, but it is unclear whether the Board relied on the failure in denying the motion.  *See Bi
Feng Liu v. Holder*, 560 F.3d 485, 491 (6th Cir. 2009) (upholding Board's denial of a motion to
reopen in part because the motion did not include an asylum application).  We assume it did not.

excuse Vaid's daughter from the courtroom and he did not wish to frighten her. But Vaid's quarrel with the judge's courtroom procedure could have been raised during circuit court review of that decision. It is too late to raise it now, in a motion to reopen. *See Yu Yun Zhang*, 702 F.3d at 882 (declining to take up, on review of a reopening denial, a challenge to an adverse credibility finding that could have been raised in an earlier petition for review). The Board was within its discretion not to reopen proceedings on the basis of information that was available and could have been discovered and produced at the evidentiary hearings in 2005.

Second, the Board recognized that not all of petitioners' submission relied upon evidence that could have been discovered and presented earlier; some of it is indeed new. Nevertheless, the Board found any new evidence insufficient to warrant reopening. It addressed sex trafficking and Albania's political climate separately. Regarding sex trafficking, it noted that the evidence did not show trafficking to be of recent onset in Albania. That conclusion is reasonable. The submitted articles that post-date 2005 (and are therefore "new") demonstrate merely that sex trafficking in Albania is a large problem and has received more media attention recently, not that it has significantly *increased* since 2005. Dr. Williams states the following: "As stated previously there has been a marked upsurge of kidnaping for forced prostitution in Albania in recent years, especially since 2008, and the risk of this to someone who has been targeted by opponents previously are even higher." But no cross-reference is supplied, and we cannot find where the first proposition is "stated previously" in the report. Nor is there any evidence in the report, apart from conclusory statements by Dr.

Williams, showing that political operatives are increasingly—since 2005—using the prostitution slave trade to persecute opponents.

Regarding Albania's political climate, the Board did acknowledge that new evidence demonstrated an increase in "political unrest and instability, corruption, and criminal violence," but found it similarly inadequate to warrant reopening. This conclusion is also reasonable.

The fact that conditions in a movant's home country have changed is insufficient, by itself, to warrant reopening; the changes must be "material" to his situation. 8 U.S.C. § 1229a(c)(7)(C)(ii). He must show how the changes affect in some way his eligibility for asylum. *See Moosa v. Holder*, 644 F.3d 380, 385 (7th Cir. 2011) ("The Board is required to evaluate whether the alleged changed circumstances are 'material' to the applicant's request for asylum," which "in turn invites the Board to determine whether these changes provide the applicant with a well-founded fear of persecution."). Yet a movant need not conclusively establish eligibility for asylum to secure reopening; he need only set out a prima facie case of his eligibility, by submitting objective evidence that shows a "reasonable likelihood" or "realistic chance" that he can later establish eligibility. *Yu Yun Zhang*, 702 F.3d at 880; *Smith v. Holder*, 627 F.3d 427, 437 (1st Cir. 2010); *accord In re S-V-*, 22 I. & N. Dec. 1306, 1308 (BIA 2000); *see also INS v. Doherty*, 502 U.S. 314, 323 (1992) (a movant's failure to establish a prima facie case for relief is reason enough not to reopen).

Along these lines, we have said that a "motion to reopen based on changed country conditions 'cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat *of individual*

- 6 -

*persecution*.'" *Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004) (emphasis added) (quoting *Dokic v. INS*, No. 92-3592, 1993 WL 265166, at *5 (6th Cir. July 15, 1993) (per curiam)). "The feared persecution must relate to the alien individually, not to the population generally." *Id.* (internal quotation marks omitted). (Asylum requires a well-founded fear of *individualized* persecution. *See In re Sanchez & Escobar*, 19 I. & N. Dec. 276, 284 (BIA 1985).) So in *Harchenko*, for example, we upheld the Board's denial of the petitioner's motion to reopen because, despite changed human rights conditions in Ukraine, the petitioner "fail[ed] to explain how [the changes] would affect him if" he were returned there, and thus "failed to demonstrate the 'individualized' fear or persecution required for asylum." 379 F.3d at 410. And in *Kiota v. Holder*, 389 F. App'x 491 (6th Cir. 2010) (per curiam), we similarly declined to disturb the Board's decision where the petitioner failed to show how a post-removal military *coup* in Mauritania "presented a threat of future harm to petitioner individually." *Id.* at 493. Because the new evidence Harchenko and Kiota submitted failed to materially alter their eligibility for asylum, reopening was unwarranted.

Here, the Board acknowledged an increase in "political unrest and instability, corruption, and criminal violence" in Albania. But it concluded that the changes in conditions did not alter in any meaningful way the family's eligibility for asylum, for they failed to show "how their fears differ from those of the populace as a whole." It cited *Matter of Sanchez & Escobar*, 19 I. & N. Dec. 276 (BIA 1985), where the Board reiterated its long held view that "generally harsh conditions shared by many others in a country and the harm arising out of civil strife [does] not amount to

'persecution'" for purposes of establishing asylum eligibility. *Id.* at 284. The Board acted within its discretion.

Petitioners point to passages in Dr. Fischer's report that they believe show they will face more danger than other Albanians if returned. But the Board could reasonably find these passages either insufficiently specific or inapposite. For example, Dr. Fischer references "a long history of strained relations" between the Movement for National Development and Albania's two major political parties, and notes that "several prominent [Movement] leaders were arrested during the elections of February 2007." But no details of the arrests are provided, so it is unclear *why* the leaders were arrested, and, more importantly, whether it was *because of* their political opinions. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). Nor is there an indication that Vaid is similarly situated to "prominent [Movement] leaders." (Vaid was apparently "a member and activist" of the Legality Party, which is "associated" with the larger Movement. And he admittedly retired from party politics in 1997.)

Dr. Fischer also references Albania's "flawed elections of 2009," which apparently sparked a political crisis that has had a "profoundly negative" effect on "almost all aspects of Albanian life." But he does not explain how petitioners would be more negatively affected than the general Albanian populace. He also mentions that "[i]ncreased tension has led to increased political violence with political activists being threatened, injured and killed." But again, we are left in the dark regarding specifics of these incidents, including why the activists were harmed and whether Vaid is similarly situated. We are further told that the 2011 resignation of the Deputy Prime Minister under a cloud

of scandal precipitated "a massive anti-government demonstration—involving as many as 200,000 demonstrators—which quickly degenerated into violence leaving four dead, over 150 injured and scores arrested." How Vaid is more likely than the average Albanian to be affected by this because of his past membership in the Legality party is left unsaid. And the same goes for the fact that "local elections" in May 2011 were "accompanied by an increased level of political violence with incidents occurring nearly every day in the weeks running up to the actual vote"—how are petitioners likely to be specifically affected by events like this? Dr. Fischer does not say.

Conspicuously absent from Dr. Fischer's report is the only sort of evidence that would support the Hyzotis' request for reopening—specific evidence showing that former members of the Legality or Movement for National Development parties, or those who otherwise hold such views, are subject to a heightened risk of persecution on account of their beliefs or former membership in the parties. Absent evidence demonstrating that the family has a "realistic chance" of later establishing a well-founded fear of persecution, the Board was within its discretion not to reopen their removal proceedings.

## IV.

Petitioners separately contend that they were denied due process because the Board failed to fully consider the two expert reports and the news articles attached to their motion. But as we have explained before, an alien's right to a "full and fair hearing" before an immigration judge does not extend to purely discretionary relief such as reopening. *Gasca-Rodriguez v. Holder*, 322 F. App'x 447, 449 (6th Cir. 2009); *accord Moosa*, 644 F.3d at 385. Moreover, petitioners are simply

mistaken. Although the Board's decision was brief, it did mention both reports, and it provided enough reasoning to permit meaningful review. That is all we require. *See Bi Feng Liu*, 560 F.3d at 491 n.5.

V.

For these reasons, we deny the petition for review.